IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SEALED PARTY, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-2229 |
| | § | |
| SEALED PARTY, *et al.*, | § | |
| Defendants. | § | |

## AMENDED OPINION [REDACTED]

The only remaining claim pending before the Court in this case is a breach of
fiduciary duty cross-claim asserted by Cross-Plaintiff ("the Client") against Cross-
Defendants, the "Attorney" and his law firm (collectively, "the Attorney").[1]  The merits of
this cross-claim were tried to the Court without a jury during sessions held in November and
December 2005.  The Client contends the Attorney breached his fiduciary duty to the Client
by issuing a June 2004 press release, which was published on the Internet, among other

---

[1]     The Court's Opinion issued January 31, 2006, is **vacated**.  This Amended Opinion is issued
in its stead.  This Amended Opinion is not filed under seal, as are the other pleadings and
rulings in this case.  The Court took the extraordinary step of sealing all prior proceedings in
this case, including the parties' names, at the Plaintiff Company's urging, in order to protect
the value and contents of a confidential settlement agreement discussed hereafter.  For
reasons set out more fully in a separate Memorandum and Order signed April 19, 2006,
maintenance of the secrecy of the cross-claim contentions and rulings would not advance the
goals defined by the Court in the decision to seal this file, and would contravene the public's
interest in open courts.  Further, the cross-claim and defenses advanced by the parties raise
unusual and important legal issues concerning Texas law governing fiduciary duty claims and
attorneys' duties to former clients.  The "Attorney" referred to in this Amended Opinion is
Thomas R. Ajamie, Esq.

places.[2]  The Client seeks disgorgement of the attorney's fee the Attorney received from the Client in a lawsuit (the "State Suit") filed by the Attorney on behalf of the Client against Plaintiff Company ("Company").  The Client also seeks actual damages of $46,663.30 for attorneys' fees and expenses incurred defending against the Company's claims in this federal case.

Having heard and observed the witnesses, and having reviewed all matters of record in this case, the Court makes the following findings of fact and conclusions of law.[3]

## I.  FINDINGS OF FACT

The Client, an insurance broker, initially contacted a Louisiana law firm (the "Louisiana Firm") to handle a dispute with the Company.  That firm referred the Client to the Attorney, a Texas lawyer,  who was one of two equity partners at his law firm (the "Original Firm").  The Attorney analyzed the facts and issues presented by the Client and agreed to handle the case through the Original Firm.  The Attorney enlisted the help of an associate at that Firm (the "Associate").  The Attorney engaged in pre-suit negotiations with the Company's high level representatives and/or attorneys.

---

[2]     Originally, the Client also asserted claims for professional negligence, breach of the duty of good faith in the formation of a contract, breach of contract, and public disclosure of private facts against the Attorney.  At the outset of the bench trial on his cross-claims against the Attorney, the Client abandoned all cross-claims except for the breach of fiduciary duty claim. The Court dismissed the abandoned claims with prejudice [Doc. # 196].

[3]     Any findings of fact that are more correctly deemed conclusions of law should be construed as such.  Any conclusions of law that more appropriately are deemed findings of fact should be so construed.

Negotiations were futile and, on April 26, 2002, the Attorney and Associate filed the State Suit on behalf of the Client against the Company and several other entities and individuals in Texas state court.[4]   The Attorney was listed on the pleadings as lead counsel. Both he and the Associate were listed as the attorneys of record.  At the Attorney's request, the Associate handled virtually all the day-to-day work on the matter.

The case proceeded through typical phases of litigation.  The Associate performed the vast majority of the work on the case and became the Client's primary contact person at the Original Firm.

The parties to the State Suit made various efforts to hold a mediation.  Two potential dates were cancelled.  The parties and counsel finally agreed to mediate on January 9, 2004, a date the Attorney was not available.

Meanwhile, in December 2003, the two principals in the Original Firm decided to dissolve their partnership.  The Associate asked the Client to choose which firm he wanted as his counsel in the State Suit, either the Attorney's new firm ("Attorney's New Firm") or his former partner's new firm (the "Partner's Firm"), where the Associate was to work.  The Client told the Associate he wanted the Partner's Firm as his counsel and accordingly the file was transferred.  On January 1, 2004, the Original Firm formally dissolved.  That day, the

---

[4]     The Client did not sign a contingent fee contract with the Original Firm or the Louisiana Firm until June 21, 2003.  At that time, the Attorney signed the contract on behalf of the Original Firm and the lawyer the Client originally contacted signed on behalf of the Louisiana Firm. This contract entitled the Original Firm and the Louisiana Firm jointly to 40% of the proceeds from any recovery secured for the Client in the State Suit.

Attorney began practicing under a new firm name, Attorney's New Firm, and the Partner's Firm opened for business.  The Associate maintained physical possession and control over the State Suit's file.  The Associate became the Client's primary attorney.  The Attorney's New Firm and the Partner's Firm shared office space until some time in February 2004.

Although still listed as the formal attorney of record on the State Suit's pleadings, the Attorney did no substantive work on the State Suit during the latter part of 2003 or thereafter.

On January 9, 2004, the Associate filed a pleading entitled "Notice of Counsel's Change of Law Firm."[5]  This notice directed that the Partner's Firm receive all further pleadings and correspondence in the State Suit.  From this time onward, the Associate and the Louisiana lawyer were the only attorneys listed as counsel on the court filings.

Also on January 9, 2004, the parties and counsel participated in mediation.  The Associate and the Louisiana lawyer appeared and represented the Client.  The Attorney did not attend, did not participate in any way, and gave no substantive advice about resolving the litigation.[6]  The parties reached a settlement and late in the evening finalized and signed a formal agreement titled "Confidential Settlement and Mutual Release Agreement" ("Settlement Agreement").  The Associate and the Louisiana lawyer signed the Settlement Agreement as attorneys for the Client.  The Associate signed as an attorney with the Partner's

---

[5]     Notice of Counsel's Change of Law Firm, Attorney Exhibit 4.

[6]     The Attorney's only involvement occurred the night before the January 9 mediation, when the Client saw him in the hallway of the joint offices of the two new law firms.  The Client and the Attorney briefly discussed the mediator's style, and the Attorney gave a general recommendation on how to handle the mediator at the outset of the mediation process.  There was no discussion about the substance of the State Suit.

Firm.  Neither the Attorney nor the Attorney's New Firm was a signatory.  Upon the parties'

stipulation of dismissal, the State Suit was dismissed with prejudice.

The Settlement Agreement included a confidentiality provision ("Confidentiality

Provision"), which provided in relevant part:

> **THE PARTIES AND THEIR COUNSEL IN THE [STATE SUIT] AGREE THAT THE TERMS OF THIS RELEASE AND THE FACTUAL BACKGROUND OF THE [STATE SUIT] AND DISPUTE BETWEEN THE PARTIES ARE CONFIDENTIAL**.  The parties and their counsel in the [State Suit] further understand and agree that:
>
> (i)     While any party may state that a settlement has been reached, the settlement terms and factual background shall be kept confidential;
>
> (ii)     confidential information that shall not be disclosed includes, but is not limited to, the following:
>
> > (a)     the amount of payments recited herein,
> > (b)     the basis on which said payments are computed,
> > (c)     the terms of this Agreement,
> > (d)     any depositions taken during the [State Suit] and accompanying exhibits,
> > (e)     any and all documents produced by an adverse party during discovery,
> > (f)     any and all responses to Requests for Production of Documents, Interrogatories, Initial Disclosures, and Requests for Admissions, and
> > (g)     any correspondence exchanged between the parties and their counsel.
>
> (iii)     confidential information shall not be disclosed, revealed, or divulged to any person, firm, corporation, news media, or to any other entity whatsoever, with the following exceptions:
>
> > a.     accountants, governmental taxing authorities,
> > b.     when required by order of a court of competent jurisdiction or otherwise compelled by law; and

> c.    with the prior written consent of [the Client] and [the Company].

*    *    *    *

> (v)    no party or their counsel shall categorize this Agreement or the outcome of the [State Suit] as a victory for themselves or a defeat of the other party or suggest that this Agreement or the terms thereof constitute something other than the settlement of a dispute without an admission or finding of liability on the part of either party;

*    *    *    *

> (vii)   that a breach of the obligations under this confidentiality provision by any party shall be a material breach hereof, entitling any party to assert the maximum legal remedy available to it under the law; and that this Agreement will in all other respects remain in full force and effect.[7]

On or about March 1, 2004, the Attorney received $66,153.41 out of the settlement proceeds, the Partner received $66,153.41, and the Louisiana Firm received $176,409.10.

The Associate left the Attorney a brief voicemail message late in the day on January 9, 2004, stating that the State Suit had been settled and that the Company had insisted upon stringent confidentiality terms.  As evidenced by a congratulatory email about the State Suit that the Attorney sent on January 14, 2004, to twenty-one employees of the Attorney's New Firm and the Partner's Firm,[8] the Attorney clearly received notice of the settlement, but

---

[7]    Settlement Agreement, Client Exhibit 2, at 6–7.

[8]    *See* Attorney Exhibit 7.  The email stated:

> I want to acknowledge the hard work and success that [the Associate] had last Friday when he settled the [the Client] case.  You may know that we represented our client [the Client] in suing [the Company] to recover commissions and other money due him. [The Associate] settled the case for

(continued...)

either did not hear the Associate's voicemail message at all, or did not listen to it carefully, and did not learn of the specifics of any confidentiality terms.

On the other hand, it is clear that before, during and after the settlement, the Attorney knew that the Company was highly sensitive about the existence of the State Suit and the claims alleged.  The Company made it clear to him personally during the pre-suit and early post-filing negotiations that he conducted with the Company's officers and attorneys that the Company wanted any settlement they might reach to be confidential.

Sometime near the end of May 2004, the Attorney began drafting a press release to announce the settlement of the State Suit ("Press Release").  The Attorney worked on several drafts and eventually instructed his assistant to submit the Press Release to PR Newswire for publication.  The Attorney's assistant carried out these instructions on June 2, 2004, at approximately 4:30 p.m.[9]  On June 3, 2004, PR Newswire published the Press Release, which appeared on the Internet and other news sources.  The Press Release stated:

> [The Client] . . . . alleged that a secret [Company] plan to reduce or underpay sales commissions and damage marketing partners such as [the Client] was concealed by pervasive problems with [the Company's] information systems.

---

[8]      (...continued)
> just under $1 million.  Pl[ease] congratulate [the Associate] when you see him.

> Interestingly, the Associate (who was a recipient) did not respond to the Attorney's congratulatory email or remind the Attorney of the Confidentiality Provision's requirements, despite the email's distribution to everyone in the two law firms.

[9]      PRN Release Tracking Form, Attorney Exhibit 46.

[The Client] had sued [the Company] . . . in Texas state district court for fraud, tortious interference and breach of contract, and sought seven-figure damages. (The defendants denied the allegations.)

According to [the Attorney], the lead lawyer for [the Client], the terms of the settlement are confidential.  [The Attorney] said, "[the Client] valued [his] long relationship with [the Company] and regretted having to pursue legal action, but [the Client is] satisfied with the resolution of the matter."

[The Client's] interests were represented by [the Attorney] of [Attorney's New Firm] in Houston and New York, and [the Louisiana lawyer with the Louisiana Firm], in New Orleans.[10]

According to the Attorney, in late May and very early June 2004 before issuing the Press Release, he sought unsuccessfully to obtain the State Suit file from the Partner's Firm and the Associate.[11]  This file had value to the Attorney only if he represented others who wanted to sue the Company on claims comparable to the Client's.  The Attorney did not need the file to render any further service to the Client.  The Associate refused to turn over the file, fearing that such an act would violate the Confidentiality Provision that he and the

---

[10]     Press Release, Client Exhibit 12.

[11]     The written record only shows one pre-Press Release written communication from the Attorney, an email to the Partner on June 2, 2004, stating that "[the Associate] took my [the Attorney's] file and won't give it back to me. [G]ive it to me today or I'll sue [the Associate] this week."  Client Exhibit 11.  On June 3, he also faxed a vitriolic letter to the Associate personally at about 4:00 p.m.  Client Exhibit 13.  This letter was faxed approximately thirty minutes before the Press Release was published on the Internet.  *See* Attorney Exhibit 46.

Client had signed but the Attorney had not.[12]  This defiance infuriated the Attorney, who sent various intemperate and threatening letters to the Associate and the Client.[13]

In sum, at the time he submitted the Press Release on June 2, 2004, and when the Press Release was published the next day, the Attorney had not read and did not know the precise contents of the Settlement Agreement.  Neither the Associate, the Louisiana lawyer, nor the Client had described, given, or shown the Attorney a copy of the Settlement Agreement or the Confidentiality Provision.  It is also true, however, that the Attorney had not sought a copy, or attempted to discuss the terms of the Confidentiality Provision with the Associate, the Louisiana lawyer, or the Client.  Although the Attorney had not inquired

---

[12]  The Associate responded almost immediately, by letter dated June 3, 2004, delivered to the Attorney by hand, explaining why he would not return the file.  Client Exhibit 14.  The Associate stated that "the settlement agreement contains very comprehensive confidentiality provisions" and summarized them in some detail.  *Id.*  It appears that this is the first time the Attorney was informed with any precision of the contents of the Confidentiality Provision.

[13]  *See* Email from the Attorney to the Partner dated June 2, 2004, Client Exhibit 11 (*see supra* note 11); Letter from the Attorney to the Associate dated June 3, 2004, Client Exhibit 13 ("I expect [the Client] file to reappear in my office today.  A suit will be filed Monday morning.  I will also notify the State Bar of Texas accordingly."); Letter from the Attorney to the Client dated June 9, 2004, Attorney Exhibit 88 ("I am very disappointed in your behavior. . . .  I hold you in higher regard and was astonished to see you would join in with [the Associate], a lawyer I decided to eject from my firm due to unethical behavior, on such a ridiculous basis."); Email from the Attorney to the Client dated June 11, 2004, Client Exhibit 19 ("You didn't pay a single penny from your pocket.  Yeah, use me, my employees, my national reputation, and then run off.  You're not a man. . . . Like a coward, you never even spoke to me about our relationship ending."); Email from the Attorney to the Client dated June 12, 2004, Client Exhibit 25 ("As for 'getting back at [the Associate],' let me tell you something, I pitty [*sic*] the guy.  He's a sad figure.  He's in his mid-50's and has no clients or work of his own. . . . I've made a fortune as a lawyer.  I don't need to work another day of my life. . . . Your case was not a big money maker for the firm. . . . The point of this is that I don't need your case.").

whether the terms were confidential, he nevertheless *was* aware that there was some confidentiality requirement.  As he stated in the Press Release, "the terms of the settlement are confidential."[14]   The Attorney also never sought permission to make the particular statements he included in the Press Release.  He did not seek approval from the Client, the Associate, or anyone else involved in the State Suit to issue any press release at all.

The Attorney included in the Press Release his own quote, which he believed to be true, characterizing the Client's opinions.   He stated: "[the Client] valued [his] long relationship with [the Company] and regretted having to pursue legal action, but [the Client is] satisfied with the resolution of the matter."[15]   The sentiments the Attorney attributed to the Client were based on the Attorney's personal opinion of the Client's views over almost two years.  The Attorney, however, made no effort to ascertain the Client's actual thoughts about the settlement when the Client agreed to it in January or at the time of the Press Release in June.  The Court nonetheless is persuaded that the Attorney's characterizations of the Client's opinions in June 2004 were essentially correct.[16]

---

[14]     Press Release, Client Exhibit 12.  The Attorney argues he believed and meant to convey in the Press Release that the settlement *amount* was confidential, but he did not so state in the release, despite personally working on at least three drafts before its issuance.  The Court is unpersuaded that the Attorney did not know there was a confidentiality requirement in the Client's settlement with the Company.  The Attorney is held to what he wrote in the Press Release.

[15]     Press Release, Client Exhibit 12.

[16]     The Client at trial made only tepid and unconvincing denials about being  "satisfied" with the settlement, "valu[ing]" his "long relationship" with the Company, and "regrett[ing] having to pursue legal action," as the Attorney reported.

On June 9, 2004, upon learning of the Press Release, the Company filed suit against the various Defendants in this federal case claiming breach of contract and other causes of action associated with alleged violations of the Confidentiality Provision and duties arising from the parties' relationships.

In March and April 2005, the Company dismissed its claims against all Defendants except the Attorney.[17]  Most pertinent to the cross-claim, on April 1, 2005, the Company and the Client agreed in a settlement agreement in the federal action:

> [The Company] represents that it would not have brought suit against [the Client] . . . but for the fact that [the Attorney] named [the Client] in the Press Release and quoted [the Client] in the Press Release.[18]

The Client's legal fees and expenses in defense of the Company's claims in this federal case were incurred through services rendered by a federal court lawyer.  The fees and expenses totaled $46,663.30.  The Client's insurance carrier and a corporation principally owned by the Client[19] paid fees of $32,027.54 and $13,609.46, respectively, for total payments of $45,637.[20]  The Client testified that he paid $4,000 to $5,000 of these legal fees,

---

[17]    *See* Company's Joint Stipulation of Dismissal with Prejudice as to the Associate and the Partner's Firm [Doc. # 140]; Company's Joint Stipulation of Dismissal with Prejudice as to the Louisiana lawyer and the Louisiana Firm [Doc. # 150]; Company's Joint Stipulation of Dismissal with Prejudice as to the Client [Doc. # 152].

[18]    Mutual Release Agreement, Client Exhibit 28, ¶ 4.

[19]    The Client owns 76% of the stock of this corporation.  The rest is held by others independent of the Client.

[20]    *See* checks reflecting payment to the Client's federal court lawyer's firm, Client Exhibit 35, and checks representing payment to that lawyer's former firm.  Client Exhibit 36.

although he submitted no documentary proof in support of this contention.  His testimony

is rejected in this respect.[21]  A balance of $1,026.30 remains unpaid.  It appears the federal

court attorney has no intention of collecting this sum and is likely to write it off as a bad debt

expense.[22]

## II.  CONCLUSIONS OF LAW

Justice Benjamin Cardozo, at the time Chief Judge of the New York State Court of

Appeals, defined the duty the common law imposes upon fiduciaries in *Meinhard v. Salmon*,

249 N.Y. 458, 464, 164 N.E. 545 (1928):  "A trustee is held to something stricter than the

morals of the market place.  Not honesty alone, but the punctilio of an honor the most

sensitive, is then the standard of behavior."

### A.  Jurisdiction and Burden of Proof

There is complete diversity of citizenship between Plaintiff and Defendants, and the

amount in controversy exceeds the federal jurisdictional limit.  Therefore, the Court has

jurisdiction under 28 U.S.C. § 1332(a).  Venue is proper in the Southern District of Texas

because the Attorney resides in this district and a substantial part of the events giving rise to

Plaintiff's claims occurred here.  *See* 28 U.S.C. §1391(a).

---

[21]     It is unclear what fees the Client refers to in this regard.  He submitted documents at trial
consisting of billing and payment records from his federal court attorney.  The early records
were from that attorney's former firm, and the rest were from his current firm.  *See supra*
note 20.  The payment records do not contain evidence of any payments made directly by the
Client.

[22]     The Client testified that he is considering filing for bankruptcy.  The federal court lawyer
testified that he was unsure if the Client would pay the outstanding balance.

The Client, as the party requesting affirmative relief, has the burden of proving his breach of fiduciary duty claim by a preponderance of the credible evidence, which means that the credible evidence taken as a whole must show that the facts sought to be proved are more probable than not.  *See S.W. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 275 (Tex. 2002); *see also Cont'l Cas. Co. v. City of Lake Charles*, 2001 WL 502728, at *3  (5th Cir. Apr. 26, 2001) (per curiam).

The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant's breach of its fiduciary duty owed to the plaintiff; and (3) injury to the plaintiff or benefit to the defendant resulting from the defendant's fiduciary duty breach.[23]   *Kelly v. Gaines*, 181 S.W.3d 394, 414 (Tex. App.—Waco 2005, pet filed); *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App.—Texarkana 2004, no pet.) (citing *Burrow v. Arce*, 997 S.W.2d 229, 238–39 (Tex. 1999); *Hawthorne v. Guenther*, 917 S.W.2d 924, 934–35 (Tex. App.—Beaumont 1996, writ denied)).  For reasons explained hereafter, the Court concludes that at the time the Attorney issued the Press Release, the Attorney still owed a fiduciary duty to the Client, despite the fact that at that time the attorney-client relationship had terminated.  The Court also concludes that the Attorney breached that duty.  Nevertheless, the Attorney is entitled to judgment on the

---

[23]     Certain Texas courts require a plaintiff on a fiduciary duty claim to prove: (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.  *E.g., Greene's Pressure Treating & Rentals, Inc. v. Fulbright and Jaworski, L.L.P.*, 178 S.W.3d 40, 43 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Avary v. Bank of Am. N.A.*, 72 S.W.3d 779, 792 (Tex. App.—Dallas 2002, pet. denied)).

Client's fiduciary duty claim because the Client has not proven that, as a result of the breach, he was injured or that the Attorney benefitted in legally cognizable ways.

## B.      Existence of a Fiduciary Relationship

To prevail on a breach of fiduciary duty claim, the Client must first establish that he was in a fiduciary relationship with the Attorney.  Under Texas law, "[t]here are two types of fiduciary relationships—a formal fiduciary relationship that arises as a matter of law, such as principal/agent or partners, and an informal fiduciary relationship arising from a confidential relationship 'where one person trusts in and relies upon another, whether the relation is moral social, domestic or merely personal.'" *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992)); *see generally Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265–66 (Tex. App.—Corpus Christi 1991, writ denied).  The existence of a fiduciary relationship is a question of fact.  *United Teachers Assocs. Ins. Co. v. MacKeen & Bailey Inc.*, 99 F.3d 645, 649 (5th Cir. 1996).  Once the relationship is created through formal or informal means, the "fiduciary duty requires the fiduciary to place the interest of the other party before his or her own."  *Hogget,* 971 S.W.2d at 487.

Formal fiduciary duties arise as a matter of law in certain relationships, including attorney-client, partnership, and trustee relationships.  *Morris*, 981 S.W.2d at 674; *see also MacKeen & Bailey Inc.*, 99 F.3d at 649.  The attorney-client relationship is based on a

contractual relationship in which the attorney agrees to render professional services for the client. *See Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex. App.—Houston [14th Dist.] 1997, pet. dism'd by agr.) (citing *Yaklin v. Glusing, Sharpe & Krueger*, 875 S.W.2d 380, 383 (Tex. App.—Corpus Christi 1994, no writ)).

"The relationship existing between attorney and client is characterized as 'highly fiduciary,' and requires proof of 'perfect fairness' on the part of the attorney." *See Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App.—Tyler 2000, pet. denied) (quoting *Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex. 1964)). Specifically, the relationship between attorney and client has been described as one of *uberrima fides*, which means, "most abundant good faith," requiring absolute and perfect candor, openness and honesty, and the absence of any concealment or deception. *Hefner v. State*, 735 S.W.2d 608, 624 (Tex. App.—Dallas 1987, writ ref'd) (citing *State v. Baker*, 539 S.W.2d 367, 374 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.)).

In the absence of an agreement to the contrary, or special circumstances, an attorney-client relationship generally terminates upon the completion of the purpose of the employment. *See Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990) (citing *Dillard v. Broyles*, 633 S.W.2d 636, 643 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.)) Thus, generally, the fiduciary relationship ends when the attorney-client relationship is terminated. *See Wright v. Sydow*, 173 S.W.3d 534, 548 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *Thywissen v. Cron*, 781 S.W.2d 682, 686 (Tex. App.—Houston [1st Dist.] 1989,

writ denied); *Clinkenbeard v. Central S.W. Oil Corp.*, 526 F.2d 649, 653 (5th Cir. 1976); *see also Malone v. Sewell*, 168 S.W.3d 243, 251 (Tex. App.—Ft. Worth 2005, pet denied) (holding fiduciary relationship ends when physician-patient relationship ends).

It is undisputed that by June 2004, when the Attorney issued the Press Release, he was no longer the Client's attorney.  The attorney-client relationship, and thus the formal fiduciary relationship, ended when the Client selected the Associate and the Partner's Firm in early January 2004 to serve as his counsel for the balance of the State Suit.  *See Wright*, 173 S.W.3d at 548.  Alternatively, at the latest, the Attorney and the Client's attorney-client relationship ended when the Attorney received his share of the settlement funds from the State Suit on March 1, 2004.  *See Simpson*, 903 F.2d at 376.  Thus, there is no question that the Client was the Attorney's *former* client when the Attorney issued the Press Release.  The Court turns to the issue of whether the Attorney had any continuing fiduciary duties to his former client after the attorney-client relationship ended.

### C.    Scope of Fiduciary Duties Owed by Attorneys to Former Clients

Although the foregoing authorities make clear that the typical fiduciary relationship and accordingly most fiduciary duties, end when the attorney-client relationship terminates, a fiduciary, including an attorney, may have narrow but defined continuing fiduciary obligations to the former client.  The specific question here is whether there is a "fiduciary duty" under Texas law that an attorney not reveal a former client's confidential information when the revelation is without the client's permission.  The Court concludes for reasons explained in detail below that under Texas law, an attorney has a fiduciary obligation to not

reveal to third parties confidential information received from a client, or obtained by reason of the representation of that client, and that obligation survives termination of the attorney-client relationship in the absence of permission from the former client to make the disclosure.

Courts applying Texas law indicate that generally a fiduciary's duty to preserve confidential information survives the termination of the fiduciary relationship. *See Clinkenbeard*, 526 F.2d at 652 n.3 (recognizing that a fiduciary owes certain duties after the agency terminates, "such as the duty not to . . . disclose confidential information.") (citing RESTATEMENT (SECOND) OF AGENCY §§ 386, 396)); *Kirk & Carrigan*, 822 S.W.2d at 265–66 (fact that attorneys for employer informed employee that they also represented him and that any statements he made would be kept confidential raised fact issue precluding summary judgment on claim for breach of fiduciary duty when attorneys without the employee's permission later disclosed to the district attorney the employee's privileged statements); *see also RenewData Corp. v. Strickler*, 2006 WL 504998, at *12 (Tex. App.—Austin Mar. 3, 2006, no pet. hist.) (holding that an employee's duty not to use confidential information acquired during the relationship to employer's harm survives the termination of employment; the court upheld the jury's finding that defendant breached his post-termination fiduciary duty to his former employer because, *inter alia*, there was evidence suggesting defendant misused and did not protect his former employer's confidential information); *cf. Nat'l Med. Enterprises, Inc. v. Godbey*, 924 S.W.2d 123, 131 (Tex. 1996) (recognizing attorney's duty to preserve former client confidences as basis for disqualification); *Reppert v. Hooks*, 1998 WL 548784, at *8–*9 (Tex. App.—Amarillo Oct. 12, 1998, pet. denied) (stating in context

of negligence claim that attorney owed client "a duty to maintain the confidentiality of privileged communications received during the existence of the attorney-client relationship even after the termination of the relationship."); *Thompson v. Deloitte & Touche, L.L.P.*, 902 S.W.2d 13, 16 (Tex. App.—Houston [1st Dist.] 1995, no writ) (noting that accountant complied with fiduciary duty not to reveal client confidences by not informing will beneficiaries that testator had changed his will).  Courts interpreting tort law from other jurisdictions similarly suggest that a fiduciary's duty to preserve confidential information survives cessation of the fiduciary relationship.[24]

---

[24]   *See NCH Corp. v. Broyles*, 749 F.2d 247, 254–55 (5th Cir. 1985) (affirming district court's finding that, under Louisiana law, defendant was under fiduciary duty not to use former employer's confidential information for defendant's benefit); *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977) (holding that when information is exchanged between co-defendants and their attorneys in a criminal case, an attorney who is the recipient of such information breaches his fiduciary duty under Louisiana law if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994–95 (2d Cir. 1983) (finding songwriter's former manager breached his fiduciary duty to plaintiff by revealing confidential information after the fiduciary relationship ended); *Boettcher DTC Building Joint Venture v. Falcon Ventures*, 762 P.2d 788, 790 (Colo. App. 1988) ("Upon termination of the agency, an agent owes a continuing duty not to use or disclose confidential information obtained during the course of the agency. However, the remaining fiduciary obligations which arose during the agency, including the duty of loyalty, no longer exist."); *David Welch Co. v. Erskine & Tulley*, 250 Cal. Rptr. 339, 342 (Cal. Ct. App. 1988) (holding that attorney's "duty to protect confidential information continues after the formal [attorney-client] relationship ends" in affirming breach of fiduciary duty judgment in favor of law firm's former client); *see also Bank Saderat Iran v. Telegen Corp.*, 1997 WL 685247, at *7 (N.D. Cal. Oct. 16, 1997), *aff'd in part, rev'd in part on other grounds*, 30 Fed. Appx. 741 (9th Cir. Feb. 6, 2006) ("Following termination of representation, an attorney owes a continuing obligation to his former clients. . . . [C]ourts have recognized a breach of fiduciary duty where an attorney gains an unfair advantage over a former client by using confidential information obtained during the relationship.") (internal citations omitted)).

The Client contends that the Attorney violated his fiduciary obligation because the Attorney disclosed in the Press Release the Client's "confidential information."  Some of the information was contained in pleadings in the Company's State Suit and some was private. The Client further argues that the information the Attorney contends was public in fact was not "generally known," and the Attorney in any event disclosed the Client's private, personal opinions about his relationship with the Company and the litigation, as well as the non-public fact that the parties had settled the State Suit.  The Attorney counters that, under the circumstances as presented, he owed no fiduciary duty to the Client under Texas law and attorney ethical rules; and, in any event, he did not violate any continuing fiduciary duty he may have owed to the Client.  These contentions are addressed below.

### 1.   Applicability of the Standards in the Texas Disciplinary Rules to Tort Cases

To understand the scope of an attorney's fiduciary duties to a client and former client under Texas law, one must consider Texas common law, which in turn relies heavily on the ethical rules governing attorneys promulgated by the State Bar of Texas. The applicable ethical rules are the Texas Disciplinary Rules of Professional Conduct (the "Texas Rules"), which became effective in 1990 after numerous well publicized drafts and comments by the various Sections of the State Bar of Texas as well as attorneys in the state.[25]  The Texas

---

[25]     The parties agreed (until the Court issued its Opinion) that the case turns on whether the Attorney met his obligations under the ethical rules governing attorneys' relationships  with clients and former clients.  The Court accordingly stated in the Opinion that it did not need to and would not reach the issue of whether an attorney owes a former client broader fiduciary duties under Texas law than those set forth in the Texas Rules.  The parties elected
(continued...)

Rules are quasi-statutory and are enforced in disciplinary proceedings by the State Bar. Robert P. Schuwerk and John F. Sutton, Jr., *A Guide to Texas Rules of Professional Conduct*, 27A HOUS. L. REV. 1, 5 (Oct. 1990) ("*Guide to Texas Rules*") ("All of the Texas Rules are designed to serve primarily, if not solely, as disciplinary standards.").

The Preamble to the Texas Rules provides that the "(v)iolation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached." PREAMBLE ¶ 15, TEX. DISCIPLINARY R. PROF'L CONDUCT ("TEX. R."), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 2005). Nevertheless, Texas and Federal courts regularly have referred to the Texas Rules to help define standards of attorney conduct in tort cases. *See, e.g., Nolan v. Foreman*, 665 F.2d 738, 740–43 (5th Cir. 1982) (holding that an alleged violation of Texas ethical rules regarding reasonableness of fees, attorney withdrawal, and rule prohibiting an attorney in advance from attempting to exonerate himself from malpractice, stated "a cause of action for legal malpractice in the nature of a tort"); *Two Thirty Nine Joint Venture v. Joe*, 60 S.W.3d 896, 905 (Tex. App.—Dallas 2001), *rev'd on other grounds*, 145 S.W.3d 150 (Tex. 2004) (noting that the Texas Rules can be considered by the trier of fact as evidence of a violation of an existing duty of care for claims of legal malpractice or breach of fiduciary duty); *Arce v. Burrow*, 958

---

[25]     (...continued)
not to brief this issue, despite inquiries by the Court of their views. The Attorney now contends that the Texas Rules do not establish fiduciary duties and that any fiduciary duty he may have to a former client is more constricted than the duties imposed by the Texas Rules. *See* Motion to Alter or Amend the Judgment [Doc. # 207], at 1–2. The Court accordingly addresses this issue in the text hereafter.

S.W.2d 239, 245 & n.4 (Tex. App.—Houston [14th Dist.] 1997), *aff'd in part, rev'd in part on other grounds*, 997 S.W.2d 229 (Tex. 1999) (citing Texas Rule governing aggregate settlements in holding that attorney who represents two clients breaches fiduciary duty by entering into aggregate settlement without clients' informed consent); *Avila v. Havana Painting Co.*, 761 S.W.2d 398, 400 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (stating that ethical rules required attorney to deliver client funds promptly, and failure to do so gave rise to cause of action in tort); *Baker*, 539 S.W.2d at 372 ("[a]lthough the canons of ethics and their ethical considerations set out in the Rules are not binding upon this Court, those canons are highly persuasive and are due our utmost consideration."). Thus, although the Texas Rules are not dispositive, they may be considered evidence and significantly inform the analysis of the scope of fiduciary duties between attorneys and their clients, as well as between attorneys and their former clients.

### 2.    Overview of Texas Rule 1.05—Duties to a Former Client

There is no question that at the time he issued the Press Release, under the Texas Rules, the Attorney owed a duty to his former client not to "reveal" "confidential information" to others unless authorized expressly or implicitly by former client to do so. *See generally Perez*, 822 S.W.2d at 265–66; *see also* TEX. R. 1.05(b), (c). The parties do not dispute that "reveal" means "to make known" or "disclose" to another person. *Accord*, THE RANDOM HOUSE WEBSTER'S DICTIONARY 568 (1993).

Rule 1.05 protects "confidential information." "Confidential information" is divided into two categories for Rule 1.05 purposes: "privileged information" and "unprivileged client

information."   The parties' dispute concerns primarily, although not exclusively, unprivileged information.[26]

Generally, Texas Rule 1.05(b)(1) prohibits a lawyer from "knowingly" "revealing" any type of "confidential information" of a client or a former client to "(i) a person that the client has instructed is not to receive the information; or (ii) anyone else, other than the client, the client's representatives, or the members, associates, or employees of the lawyer's law firm."  Other subsections of Texas Rule 1.05 set forth when client information *may* be revealed.  First, Texas Rule 1.05(c) provides in pertinent part that a lawyer may reveal "privileged" and "unprivileged" "confidential information":  (i) when *expressly* authorized to do so by the client in order to carry out the representation; (ii) when the client consents after consultation; (iii) to the client's representatives and to lawyers and other employees of the lawyer's firm, except as instructed otherwise by the client; (iv) when the lawyer has reason to believe that disclosure is necessary to comply with a court order, the Texas Rules, or other law; and (v) to the extent necessary to enforce a claim or defense in a controversy between the lawyer and the client.

Under Texas Rule 1.05(d), a lawyer also may reveal "unprivileged client information" (to the extent here relevant): (i) when the attorney is *impliedly* authorized to do so by the client or former client in order to carry out the representation; (ii) when the lawyer has reason to believe it is necessary to disclose the information in order to carry out the

---

[26]      *See infra* note 46.

representation effectively; or (iii) when the lawyer must do so in disputes with or relating to the client.[27]

Thus, under Texas Rule 1.05(b), to the extent relevant for present purposes, the Attorney had a continuing duty to not knowingly reveal confidential information relating to the Client or obtained from the Client or other sources without the client's permission. The Court holds that this duty was a continuing fiduciary duty that survived the Client's termination of the attorney-client relationship.

### D.    Application to the Press Release of Texas Rule 1.05 and the Related Fiduciary Duty of Confidentiality

The Attorney asserts that issuance of the Press Release violated no duties to the Client because the Release revealed only information that either was not "confidential" at all or was at the time of the Press Release in publicly available court records, and thus was "generally known."[28] The Court first addresses what constitutes "confidential information" under Texas Rule 1.05, whether the Press Release contained such information, and whether the Attorney's issuance of the release was permitted by any provision of Texas Rule 1.05. The Court then turns to whether the "generally known" standard, about which the parties argue extensively, is even relevant. Next, the Court addresses whether the Attorney's conduct was "knowing," and whether he violated Texas Rule 1.05(b)(1). In summary, the Court concludes that all of the information in the Press Release was "confidential" under

---

[27]    The other situations in which an attorney may reveal unprivileged client information are not pertinent.

[28]    *See* Attorney's Brief Regarding Duties of Lawyers to Former Clients [Doc. # 187], at 3.

Texas Rule 1.05; that no provision of Rule 1.05 permitted the disclosure contained in the Press Release under the circumstances presented; that this case does not require analysis of the "generally known" standard, which applies only to "use" of confidential information under Texas Rule 1.05(b)(3); that the Attorney knowingly issued the Press Release; and that the Attorney thereby violated Texas Rule 1.05(b)(1).

1.    **Attorney's Right to Reveal "Confidential Information" and "Unprivileged Client Information"**

a.    *Legal Analysis*

The Court next considers whether the Press Release contained "confidential information" under Texas Rule 1.05(a) and whether the Attorney's disclosure in the Press Release is permitted by Texas Rule 1.05.

"Confidential information" in Texas Rule 1.05(a) is extremely broad:

> "Confidential information" includes both "privileged information" and "unprivileged client information." "Privileged information" refers to the information of a client protected by the lawyer-client privilege of Rule 503 of the Texas Rules of Evidence or of Rule 503 of the Texas Rules of Criminal Evidence or by the principles of attorney-client privilege governed by Rule 501 of the Federal Rules of Evidence for United States Courts and Magistrates. "Unprivileged client information" means all information relating to a client or furnished by the client, other than privileged information, acquired by the lawyer during the course of or by reason of the representation of the client."

Tex. R. 1.05(a) (quotation marks in original).  "[A]n attorney's duty of confidentiality is broader than just client communications, and extends to all confidential information, whether privileged or unprivileged, and whether learned directly from the client or from another source." *Perillo v. Johnson*, 205 F.3d 775, 799, (5th Cir. 2000) (applying Texas law); *see*

*also* STEPHEN GILLERS & ROY D. SIMON, REGULATION OF LAWYERS, STATUTES AND STANDARDS 86–87 (2002).

Texas courts have stated that "virtually any information relating to a case should be considered confidential [under Rule 1.05]." *Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831, 834 (Tex. 1994); *Pollard v. Merkel*, 114 S.W.3d 695, 700 (Tex. App.—Dallas 2003, pet. denied) (quotation omitted) ("Moreover, virtually any information relating to a case should be considered confidential: [Texas Rule 1.05] define[s] 'confidential information' to encompass even unprivileged client information."); *see* Honorable James E. Kinkeade, *The Top Ten Reasons Clients File Grievances Against Their Lawyers*, 5 TEX. WESLEYAN L. REV. 35, 52 (1998) ("The term 'confidential information' as used by [Texas Rule 1.05] includes all information gained during, prior to, or after the course of representation."); *Guide to Texas Rules*, at 82 (Texas Rule 1.05(a) "requires a lawyer to protect not only communication subject to the attorney-client privilege, but also any other information 'relating to a client or furnished by the client . . . during the course of or by reason of the representation of the client.'"); *see also Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 369–70 (5th Cir. 1998) (stating that confidence in context of similar Louisiana ethical rule "means exactly what the rule says—any information relating to representation of a client"); *In re Bivins*, 162 S.W.3d 415, 420 (Tex. App.—Waco 2005, no writ) ("A violation of Rule 1.05 with respect to a former client occurs when the attorney reveals confidential information

to an unauthorized third person or uses confidential information to the disadvantage of the former client without the client's consent.").[29]

There are no reported Texas judicial decisions or rules addressing a threshold disputed issue in this case: whether, for fiduciary duty purposes, client-related information that originally was "confidential information" under Texas Rule 1.05 may be revealed at the attorney's option once the information has been included in court pleadings.[30] The Attorney

---

[29] It is additionally noted that most of the reported cases involve disqualification disputes, which themselves require a two-step analysis:  First, does the new and questioned representation violate the Texas Rules and, if so, what remedy is appropriate.  The first inquiry in the disqualification cases, therefore, is potentially probative to the issue at bar, whether the Attorney violated any ethical duty under the Texas Rules.

[30] The only Texas authority this Court has located even broaching the issue of whether information in the public record is deemed confidential under the Texas ethics rules is the State Bar of Texas Committee Opinion, No. 463 (June 1989), which applied former Texas Code of Professional Responsibility DR 4-101(A) and (B) (now repealed).  In Opinion No. 463, the State Bar Committee ruled that an attorney may "use" information, which was a matter of public record and acquired from a prospective client, to the detriment of that prospective client and for the advantage of an existing client, even though the existing client would not have had actual knowledge of the public information had it not been for the disclosure by the prospective client to the attorney.  The committee also decided that the attorney has a duty to his existing client to "use" matters of public record, even though he obtained knowledge about the information from a prospective client, and the existing client would not have had actual knowledge of the matter had it not been for the disclosure of public information by the prospective client to the attorney.  *Id.*  This decision, however, is not dispositive, if even relevant.  The ruling is based on a repealed ethics rule, Texas Code, DR 4-101(B)(2), which protected client "confidences" and "secrets" from "use" by the client's attorney to the disadvantage of the client or for the attorney's own or another person's advantage, unless the client consented after full disclosure.  Under Texas Code DR 4-101(A), the term "confidence" was limited to matters protected under the attorney-client privilege.  *See* Opinion No. 463, at 2.  The term "secret" referred to "other information gained in the professional relationship  that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely . . . detrimental to the client."  *Id.*  These categories of information are more restrictive than the matters protected by Texas Rule 1.05(a).  *See infra* at pages 27–32. Further, unlike the circumstances at bar, the State Bar

(continued...)

contends that, under Texas Rule 1.05, "confidential information" does not encompass such information. The Court is unpersuaded.

To decide this issue, the Court first must analyze carefully the language of the Texas Rules. Throughout Texas Rule 1.05, the drafters chose the phrase "confidential information" as a term of art. Texas Rule 1.05 covers what obviously is not "confidential" in the sense the word is used in some other legal contexts such as the attorney-client privilege. *See, e.g.*, *Guide to Texas Rules*, at 83 & nn.34, 36, 37 (discussing the limits of the attorney-client privilege with respect to the identity and address of the client); *Perez*, 822 S.W.2d at 266. Most significantly, Texas Rule 1.05(a)'s definition includes "unprivileged client information."[31] Thus, the word "confidential," when coupled with the word "information" in Texas Rule 1.05, covers a wide range of matters. Nothing in Texas Rule 1.05(a) or elsewhere in the Texas Rules suggests that client information loses its status as "confidential" vis à vis the former attorney merely because the information has been disclosed in court pleadings.[32]

---

[30]    (...continued)
committee's ruling addressed competing interests of a prospective client (albeit one entitled to "client" status) and an attorney's duty to a pre-existing client, not the interests of a former client and the attorney personally.

[31]    The Attorney's contentions to the contrary amount to the argument that the phrase "confidential information" is restricted to "privileged information" in Texas Rule 1.05(a) and ignore the "unprivileged client information" component of that Rule.

[32]    The parties offered conflicting testimony on various issues from attorneys proffered as ethics law experts, Michael S. Quinn for the Client and Walter W. Steele, Jr. for the Attorney. The witnesses in large part testified on legal interpretations of the Texas Rules, topics within the Court's province. Furthermore, both witnesses conceded that Texas courts have not
                                                                                            (continued...)

Moreover, the history of the Texas Rules, as compared to the preceding Texas ethical rules, the Texas Code of Professional Responsibility ("Texas Code"), supports this broad interpretation of the term "confidential information."  Pre-eminent Texas commentators, Professors Robert P. Schuwerk at the University of Houston Law Center and John F. Sutton, Jr. at the University of Texas Law School, explained in 1990 in their definitive treatise on the then new Texas Rules: "[Confidential] information is substantially broader than the prior Texas ethics rules embodied in the Texas Code, Disciplinary Rule [("DR")] 4-101(A), which only shielded information 'gained in the professional relationship' that either the client requested the lawyer to keep secret, or which would embarrass or likely be detrimental to the client if disclosed." *Guide to Texas Rules*, at 82.  The Texas Rule is more broad in that it also protects unprivileged client information, TEX. R. 1.05(a), and "information relating to the representation even if acquired before the relationship exists or after it ceases." *Id*.  "The philosophy underlying this conservative approach is that disclosure of client confidences, even in self-defense, should only occur as a matter of necessity." *Id.* at 90 (citing TEX. R.

---

(...continued)

   addressed this key issue.  It is not persuasive that one or both of the witnesses may have been involved in the drafting of the Texas Rules.  These Rules were drafted by eight subcommittees of a large committee of the State Bar of Texas ("SBOT"), which started work to revise the existing Texas Code in 1984.  Each subcommittee prepared drafts of particular rules and revisions on their own, starting with the American Bar Association's Model Rules of Professional Conduct.  Revised drafts then were presented to the full SBOT committee.  There were numerous sets of revisions based on extensive comments from members of the bar and SBOT sections over a period of six years.  The SBOT membership approved the Rules in 1990. *See Guide to Texas Rules*, at 1–3.  There is no indication that either witness was involved in the drafting or analysis related to Texas Rule 1.05.  Moreover, to the extent the testimony ignored the text of the Rule, the testimony is wholly unpersuasive.

1.05 cmt. 14).  Thus, the history of Texas Rule 1.05 generally and Rule 1.05(a) specifically

suggests that the Court should construe the term "confidential information" very broadly.

The very limited range of exceptions to the rule of confidentiality in Texas Rule 1.05

also supports the Court's broad interpretation of the phrase "confidential information."  A

lawyer may reveal confidential information only in defined circumstances, each of which is

set out in of Rule 1.05.  "Lawyers have a general duty not to reveal confidential information

to anyone other than the client, the client's representatives, or the members, associates, or

employees of the lawyer's law firm unless the present or former client otherwise instructs."

*Id*., at 84 (citing TEX. R. 1.05(b)(1)).  More specifically, under Texas Rule 1.05, an attorney

may reveal confidential information, both privileged and unprivileged, if he has either

express client authorization and does so to carry out the representation, TEX. R. 1.05(c)(1),

or when he has the client's consent after consultation, TEX. R. 1.05(c)(2).[33]  An attorney may

"reveal" unprivileged client information, insofar as relevant to this case, if the client

impliedly authorized him to do so and the disclosure is "to carry out the representation,"

TEX. R.  1.05(d)(1), *or* if a lawyer "has reason to believe it is necessary to do so" and the

revelation is necessary "in order to carry out the representation."  TEX. R. 1.05(d)(2)(i).

Nowhere in Rule 1.05 (or anywhere else in the Texas Rules cited by the parties or located

---

[33]     The balance of the exceptions to confidentiality in Texas Rule 1.05(c) are not relevant to this
case.  Nor is the exception in subsection (e)—governing situations when the lawyer has
confidential information clearly establishing that the client is likely to commit a criminal or
fraudulent act—relevant here.  The exception in subsection (f), requiring disclosure of
confidential information to comply with other Texas Rules, is also not implicated in this case.

by the Court) is an attorney permitted to reveal client-related information deemed confidential under the Texas Rules without client permission.[34]

These rules apply equally to the attorney's conduct during and after the representation.  *See* Tex. R. 1.05(b)(1) (rule is applicable to former clients).  Furthermore, the rules apply equally to information learned before, during, and after the representation. *Guide to Texas Rules*, at 82.[35]  The exceptions to the blanket rule of confidentiality permitting an attorney to "reveal" client information are balanced to enable an attorney to perform services for the client by communicating client information to opponents and others formally in court pleadings and correspondence, and informally either to further the goals of the representation or to protect the attorney in defense of claims against him.

Texas Rule 1.05 grants the attorney discretion to determine what is necessary to carry out or to further the goals of the representation, but it reflects careful judgments that attempt to balance fairly and sensibly the rights of clients and former clients against the rights and needs of attorneys.  The scope of circumstances under Texas Rule 1.05 in which an attorney may "reveal" client and former client confidential information demonstrates the Rule drafters' intent to place generally the interests of clients and former clients above the personal interests of the attorney when the attorney seeks to reveal the information outside

---

[34]     An attorney also may defend himself against or in connection with claims between the client and the attorney.  Such a situation is inapplicable here.

[35]     Honorable James E. Kinkeade, *The Top Ten Reasons Clients File Grievances Against Their Lawyers*, 5 Tex. Wesleyan L. Rev. 35, 52 (1998) ("The term 'confidential information' as used by [Texas Rule 1.05] includes all information gained during, prior to, or after the course of representation.").

the attorney's representation of the client.  The priorities reflected in Texas Rule 1.05 for an attorney's "use," *i.e.*, private or unstated reliance on knowledge of a client's information,[36] are materially different.   Regarding "use," the drafters considered and weighed several factors:  the existence or termination of the attorney-client relationship, the harm or lack thereof to the client/former client, and the exposure the information has previously had beyond the attorney-client relationship.  The drafters notably did not provide comparable factors to define when attorneys may "reveal" confidential client information to third parties. The restrictions on an attorney's "use" of confidential client information are much less onerous than restrictions on an attorney's "revealing" to third parties of such client information.  The relative leniency in the "use" rules presumably emanates from the realistic premises that, first, an attorney cannot mentally ignore what she has learned during representation of a client and, second, the private (undisclosed) use of the information is likely to cause less, if any, harm to a client or former client.   Where the attorney-client relationship continues, the only restriction on an attorney's "use" of the information is that attorney may not harm the client by using the information without the client's consent after consultation.  *See* TEX. R. 1.05(b)(2).  Where the representation has concluded, the attorney has more leeway:  he may "use" the information (but, again, not "reveal" it to others) without restriction if the use does not harm the former client.  *See* TEX. R. 1.05(b)(3).  The attorney also may "use" the information "to the former client's disadvantage," *if* the attorney obtains

---

[36]      To "use" is defined as "to put into service; employ."  THE RANDOM HOUSE WEBSTER'S DICTIONARY 725 (1993).

the former client's consent after consultation *or* if the attorney can show that the information has become "generally known."  *Id.*  These alternatives have logic.  If many relevant other people already know about the client's originally confidential information, then the expectation of harm resulting from the *attorney's* subsequent use of the information, even to the client's disadvantage, is likely small.  As a policy matter, it is unfair and elevates form over substance to permit a former client to restrict an attorney's practice in regard to client matters that already are "generally known."[37]

This case, however, does not involve the Attorney's attempted "use" of the Client's confidential information.  Rather, the Attorney "revealed" the Client's unprivileged information publicly and widely in the Press Release for purposes unrelated to the Client's goals.[38]  Thus, the exceptions crafted into Texas Rule 1.05(b)(2)–(3) for an attorney's "use" of a client's or former client's confidential information are inapplicable, and all the Attorney's arguments pinned on the "use" prong of Texas Rule 1.05 are rejected.

The Court instead focuses on the "reveal" prong of Texas Rule 1.05(b)(1).  Because there is so little Texas authority, the Court considers to a limited extent the American Bar Association's ("ABA's") Model Rules of Professional Conduct ("Model Rules").[39]

---

[37]     *See infra* Part II.D.2 for discussion of "generally known."

[38]     The fact that the Attorney did not seek to reveal the information for the benefit of a new client does not relieve him of responsibility under Texas Rule 1.05.   The Court sees no material difference that assists the Attorney between an attorney accepting a new paying client who could benefit from the attorney's revealing a former client's confidential information and the attorney advertising about the prior client's matter for the purpose of attracting new clients.

[39]     "[T]he [Texas Rules] drafting committee followed the ABA's approach with respect to expanding the scope of the communications protected by the obligation of confidentiality."
(continued...)

The Texas Rules, as in a majority of jurisdictions, generally follow the ABA's Model Rules, *see Perillo*, 205 F.3d at 800 n.10, although some construe the Texas Rules to be more stringent in prohibiting disclosure by attorneys.  *See* Robert B. Gilbreath, *Caught in a Crossfire Preventing and Handling Conflicts of Interest:  Guidelines for Texas Insurance Defense Counsel*, 27 TEX. TECH. L. REV. 139, 163 (1996) ("*Caught in the Crossfire*"); Thomas H. Watkins, *Ethics: Are Lawyers the Last Line of Defense for Critical Accounting, Corporate Governance and Auditing Issues Under Sarbanes-Oxley?*, 23RD ANN. INST. ON COMPUTER LAW, 735 PLI/PAT 531, 541 (Jan. - Mar. 2003) (citing *Guide to Texas Rules*, at 7).[40]  Model Rule 1.6(a) provides the foundation for much of Texas Rule 1.05.[41]  Model Rule

---

[39]     (...continued)
*Guide to Texas Rules*, at 82.  "The committee rejected the ABA's proposed reduction of the exceptions to that obligation, . . . and opted instead to align those exceptions more closely with prior Texas law," which are not here relevant.  *Id.*  These instances are when a "lawyer has reason to believe" that disclosure is "necessary" in order to comply with a court order, disciplinary rule, or other law, *id.* at 88 (citing and quoting TEX. R. 1.05(c)(4)); "when necessary to support a claim or defense against a client or to defend against a charge of misconduct" in a pending proceeding, *id.* (citing TEX. R. 1.05(c)(5)); when necessary to establish a defense against a third party's claim or charge in a pending proceeding against the lawyer "based upon conduct involving the client or the representation of the client," *id.* at 89 (citing TEX. R. 1.05(c)(6)); or when a client is using or attempting to use, or has used, the lawyer's services in the commission of a crime or fraud, *id.* at 91–92 (discussing TEX. R. 1.05(c)(7) and TEX. R. 1.02(c)).  Other than when a client is committing or attempting to commit a crime, "[t]he net effect of these changes is to force a lawyer to wait longer than required under prior law before he discloses confidential information in response to claims of wrongdoing, whether those claims are made by the lawyer's clients or by others."  *Id.* at 90.  The lawyer is even restricted when responding to claim brought by outsiders, as opposed to the client.  *See id.*

[40]     None of the distinctions between the Texas Rules and the ABA Model Rules suggest an intention by the Texas Rules' drafters to narrow the scope of the term "confidential information."  Professors Schuwerk and Sutton state that "ABA Model Rules 1.6(a) and 1.8(b) extend some of the protections granted by [Texas Rule 1.05(a)] to all 'information (continued...)

1.6(a) provides in pertinent part that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b) [which contains exceptions not here relevant]."[42]   The Model Rules thus make information "relating to" a lawyer's professional relationship presumptively confidential and such information may not be disclosed unless an exception applies.  *See* MODEL R. 1.6(a);

---

[40]   (...continued)
relating to the representation of a client,'" although the Model Rules do not define that phrase.  *Guide to Texas Rules*, at 76.  Nevertheless, like Texas Rule 1.05(a)'s term "confidential information," "'the [Model Rule's] phrase appears to encompass both 'privileged information' and 'unprivileged client information' as defined in [Texas Rule 1.05(a)]." *Id.*

[41]   Regarding the source of Texas Rule 1.05(b), "subparagraph (1) is substantially the same as ABA Model Rule 1.6(a), and subparagraph (2) is based on ABA Model Rule 1.8(b). Subparagraphs (3) and (4) have no counterpart in the Model Rules." *Guide to Texas Rules*, at 76.  Texas Rule 1.05(c), subparagraphs (1) and (2), are contained in ABA Model Rule 1.6(a) either expressly or by implication. *Id.*  The rest of the subsections have no applicability here; it nevertheless is clear that some are derived from Model Rule 1.6(b) and others have no counterpart in the Model Rules, but were derived from the Texas Code, DR 4-101. *Id.* at 76–77.

[42]   Model Rule 1.06 must be read in conjunction with Model Rule 1.9, which sets out attorneys' duties to former clients.  Particularly pertinent to Texas Rule 1.05(c) and (d) is Model Rule 1.9(c), which provides:

(c)   A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall **not** thereafter:

(1)   **use** information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2)   **reveal** information relating to the representation except as these Rules would permit or require with respect to a client.

(Emphasis added).

MODEL R. 1.9(b), (c).[43]   Protected information under the Model Rules thus is extremely

broad, covering all information relating to the representation regardless of the source.[44]

Given the dearth of Texas authority applying Rule 1.05, the Court also considers

persuasive the reasoning in appellate cases from other jurisdictions addressing Model Rule

1.6 on the question of the scope of client information protected by Texas Rule 1.05.  A

lawyer breaches the duty of confidentiality under Model Rule 1.6(a) by revealing

information that is available from sources other than the client, including information filed

in the public record.  *See Akron Bar Ass'n v. Holder*, 810 N.E.2d 426, 435 (Ohio 2004)

(stating "an attorney is not free to disclose embarrassing or harmful features of a client's life

just because they are documented in public records"); *In re Disciplinary Proceedings Against*

*Harman*, 628 N.W.2d 351, 360–61 (Wis. 2001) (lawyer violated Rule 1.6(a) by disclosing

to prosecutor former client's medical records that he obtained during prior representation;

irrelevant whether those records lost their "confidentiality" by being made part of former

---

[43]   It is noted that Model Rule 1.6 refers to "information  relating to the representation of a client," rather than the term "confidential information" included in Texas Rule 1.05. However, the distinction is not material.  Texas Rule 1.05 defines "confidential information" to include *inter alia* "unprivileged client information" which is "all information relating to a client or furnished by the client [and] acquired by the lawyer during the course of or by reason of the representation of the client."  TEX. R. 1.05(a).  The Texas term "confidential information" therefore is at least as broad as "information" used in Model Rule 1.6.  *See Caught in the Crossfire*, at 163.

[44]   *See, e.g., In re Goebel*, 703 N.E.2d 1045, 1047–48 (Ind. 1998) (citing ABA Comm. on Ethics and Professional Responsibility, Formal Op. 94-380 (1994) (holding that "information" under Model Rule 1.6(a) includes the identity or whereabouts of a client)); MODEL RULE 1.6 cmt. 4 (The prohibition against an attorney's revealing "information" also "applies to disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person.").

client's medical malpractice action because the disciplinary rules require lawyers to "maintain confidentiality of information relating to the representation"); *In re Anonymous*, 654 N.E.2d 1128, 1129–30 (Ind. 1995) (lawyer violated Rule 1.6 by disclosing information relating to representation of client, even though information "was readily available from public sources and not confidential in nature"); *Lawyer Disciplinary Bd. v. McGraw*, 461 S.E.2d 850, 851 (W. Va. 1995) ("[t]he ethical duty of confidentiality is not nullified by the fact that the information is part of a public record or by the fact that someone else is privy to it").  To the extent the ABA Model Rules are the foundation of the Texas Rules, the Model Rules support a broad interpretation of the of the term "confidential information", in the Texas Rules.

The Court concludes therefore that an attorney generally owes a former client a continuing duty to not reveal to third parties confidential client information without the client's express or implicit permission.  This duty encompasses privileged and unprivileged information obtained from the client or acquired as a result of the representation.

**b.**   *Discussion*

The Court now turns to the specifics of the revelations in issue in this case.  The Attorney's Press Release contained the following information: (i) identification of the Attorney and the fact that he had filed the State Suit in Texas court against the Company on behalf of the Client; (ii) the claims asserted against the Company with factual allegations in support; (iii) the fact that the parties settled the State Suit; and (iv) the Attorney's impressions of the Client's views about his prior relationship with the Company, the filing

of the State Suit, and the State Suit settlement.  The first two categories are information were

apparent from a review of the State Suit pleadings.  The latter two were not.  The Attorney

knew about the Client's allegations, claims, and related matters solely because of his

representation of the Client.[45]  The Court concludes that all information in the Press Release

was acquired "during the course of or by reason of [the Attorney's] representation" of the

Client, and thus was confidential information.[46]  *See* TEX. R. 1.05(a).  For reasons described

above, the mere fact that some of the disclosed information already had been included in

court pleadings does not remove that information from the realm of "confidential

information" under Texas Rule 1.05 or alter an attorney's fiduciary duty of confidentiality

to a former client under the circumstances of this case.[47]

---

[45]  Indeed, the Attorney does not contend that he is excused because the information concerning the State Suit's settlement was acquired after conclusion of his representation of the Client. As discussed above, the definition of confidential information precludes such an argument, and the parties have cited no authority limiting the scope of Texas Rule 1.05(b)(1) to information acquired by an attorney during meaningful representation of a client.

[46]  The Attorney contends that the information about the Client's State Suit and the claims asserted therein was not confidential because the Client discussed these matters with others who may have had similar claims against the Company.  This argument fails.  There is no probative evidence that the Client described to others the allegations in the State Suit in any detail or showed State Suit pleadings.

It is noted that there is a strong argument that, at a minimum, the last item in the Press Release constitutes "privileged" information.  Nonetheless, the Court need not rely on this characterization because it is undisputed that the Client neither expressly nor impliedly authorized the Press Release at all.  Thus, the distinction between privileged and unprivileged information is immaterial in this case.

[47]  The Attorney contends that the agreed dismissal of the State Suit with prejudice clearly indicates that the parties settled their claims, and thus that the settlement was public information.  The Court is unpersuaded.  A stipulation of dismissal does not necessarily imply
(continued...)

The Court also concludes that, through the Press Release, the Attorney "revealed" confidential information in contravention of Texas Rule 1.05(b)(1).[48]  The Attorney had no authority to disclose the information in the Press Release.  Even if third parties might have found the information on their own, the Attorney had a continuing fiduciary duty not to be the conduit or source of others learning about that information.

Alternatively and independent of the foregoing, the Court concludes that the Press Release revealed the non-public information that the State Suit was settled.[49]  In addition, the

---

[47] (...continued)
that a particular party obtained a *favorable* settlement or one with which he was "satisfied," as the Press Release reports about the Client.  In any event, no dismissal order or motion is in the trial record,  and no inferences from those documents can be drawn.

It is noted that there is brief testimony in the record that the Company and the Client jointly filed a stipulation dismissing the State Suit with prejudice, but that filing did not reference a settlement or otherwise indicate any reason for the dismissal.  The Attorney submitted this document to the Court before trial as a proposed exhibit, Attorney Proposed Exhibit 13, but no party offered it and it was not received as evidence.  Therefore, the Court does not consider the contents of the document in its decision.  There is no evidence or indication that the stipulation of dismissal or anything else the parties filed in court disclosed why the State Suit was ending.  Thus, the Court rejects the Attorney's argument that the fact that the parties settled the State Suit made the settlement publicly-filed information.

[48] The Attorney could have been released from his duty not to reveal these matters publicly if authorized expressly or implicitly by the Client.  *See* TEX. R. 1.05(c), (d).  The Attorney, however, obtained no such authorization.  Indeed, he never even sought such authority from the Client.  Further, the State Suit is unlike certain well-publicized litigation.  It is noted that but for the details in the Press Release, members of the public would not have known where to look for the State Suit, even if they had some prior inkling it existed.  The State Suit was filed in a state and city different from the hometown of either party.  *See* Attorney Exhibit 18, at 2–3.  Even if information in pleadings filed in the public record in *certain* circumstances might lose "confidential" status, the matters described in the Press Release under the circumstances presented here did not.

[49] The Court rejects the Attorney's implicit contention that the existence of the settlement was
(continued...)

Release contained the Attorney's comments about the Client's opinions on the latter's relationship with the Company, the State Suit, and the State Suit's settlement.  The Attorney revealed confidential information under Texas Rule 1.05 in this regard also; the Client's opinions were not publicly available and the Attorney had no authority from the Client to publicly characterize the Client's private opinions.

Therefore, the Attorney's disclosure in the Press Release of the settlement and private Client opinions violated the Attorney's continuing fiduciary duty of confidentiality owed to the Client under Texas law.

### 2.    The "Generally Known" Exception to Confidentiality Requirements

The Attorney advocates that he did not breach his fiduciary duty to the Client because the information in the Press Release was contained in the publicly available pleadings and therefore was "generally known."  The Client correctly responds that the "generally known" exception only applies to an attorney's "use" of former client confidences (*see* TEXAS R. 1.05(b)(3)), not to the "reveal" prong of Texas Rule 1.05(b)(1); that the fact that information is in the public record does not necessarily make the information "generally known"; and that, in any event, the Press Release contained certain facts not publicly available.

---

[49]    (...continued)
not confidential because the Settlement Agreement provides that "any party may state that a settlement has been reached."  Settlement Agreement, Client Exhibit 2, at 6.  The Court previously ruled that the Attorney was neither a signatory to, nor otherwise bound or benefitted by, the Settlement Agreement.  *See* Memorandum and Order signed June 22, 2005 [Doc. # 171], at 11–14.  Furthermore, even assuming the Attorney was a party to the Settlement Agreement, the agreement's terms permit only the parties, not their counsel, to reveal the fact that a settlement occurred, nothing else.  *See* Settlement Agreement, Client Exhibit 2, at 6.

The Court interprets and applies the plain language of the Texas Rules, much like statutory analysis. *See Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1413 (D.C. Cir. 1995); *Hoff v. Mayer, Brown & Platt*, 772 N.E.2d 263, 267 (Ill. 2002); *Burkhart v. Semitool, Inc.*, 5 P.3d 1031, 1041 (Mont. 2000).  Texas Rule 1.05(b)(3) permits unlimited "use" of a former client's confidential information if the confidential information has become "generally known."  In contrast, as noted earlier, Texas Rule 1.05(b)(1), which prohibits an attorney from revealing (*i.e.*, disclosing to others) a client's confidential information, does not contain such an exception.  Texas Rule 1.05(b) thus provides distinct standards for an attorney's "use" of a former client's confidential information as compared to the attorney's "revealing" of such information.  The Attorney has not cited any authority, and the Court can find none, extending the "generally known" exception to an attorney's disclosure of a former client's confidential information.[50]

This dichotomy is comparable to that in the Model Rules.  Like Texas Rule 1.05(b), Model Rule 1.9(c) "prohibits a lawyer's use of former-client information to the former client's disadvantage—except insofar as the Model Rules would permit or require for a current client—unless the information has become generally known."  *See* ABA Annotated Model Rules of Professional Conduct, Rule 1.9 Overview (2003).  "Subsection (c) also prohibits disclosure (as opposed to use) of any and all former-client information, even

_____

[50]    As noted earlier, the Court does not find the analysis proffered by the Attorney's expert witness persuasive.

information that has become public knowledge, except insofar as the Model Rules would permit or require for a current client." *Id.* (citing MODEL R. 1.9 cmt. 8).

The Fifth Circuit has noted:  "The Texas and ABA Rules supply the same standard. The Rules do contain an exception for public information, but in each case *this exception applies only to the provision prohibiting the <u>use</u> of confidential information*. . . ."  *In re Am. Airlines, Inc.*, 972 F.2d 605, 620 (5th Cir. 1992) (emphasis added).  Other cases similarly reach the conclusion that the "generally known" exception does not apply when an attorney discloses, as opposed to merely uses, client confidences.  *See Holder*, 810 N.E.2d at 435; *In re Disciplinary Proceedings Against Harman*, 628 N.W.2d at 360–61; *In re Anonymous*, 654 N.E.2d at 1129–30; *McGraw*, 461 S.E.2d at 851.  Consequently, the Court concludes the text of Texas Rule 1.05(b) and the weight of authority limit the generally known exception to the "use" of client confidences under Texas Rule 1.05(b)(3).  In contrast, Texas Rule 1.05(b)(1) precludes an attorney from "revealing" a former client's confidential information, regardless of whether or not the information is or becomes generally known.  The "generally known" exception is therefore irrelevant to the Client's claim that the Attorney "revealed" confidential information in issuing the Press Release.

Even assuming that the generally known exception permitted the revelation of a former client's confidential information,[51] the Press Release contained information that was

---

[51]     Even assuming the "generally known" exception excused the disclosure of a former client's confidential information, it is unclear whether information in the public record is "generally known" *per se*.  There is no applicable Texas authority.  Comment d to § 59 of the Restatement (Third) of the Law Governing Lawyers teaches: "Information contained in . . .
(continued...)

not in the public record, *i.e.*, the fact that the case settled and the Attorney's impressions of the Client's opinions about his relationship with the Company, the filing of the State Suit, and the settlement.   Accordingly, even under the Attorney's construction of Texas Rule 1.05(b)(3), the Press Release contained some information that was not generally known.

### 3.   The Attorney's Conduct Was "Knowing"

The Attorney made the disclosures in the Press Release intentionally and deliberately, not by accident.   Accordingly, he acted "knowingly."   *See* BLACK'S LAW DICTIONARY 876 (7th ed. 1999).   Moreover, the Attorney purposefully disclosed information that he knew "relat[ed] to a client . . . [and which information he] acquired . . . during the course of or by reason of the representation of the client."   *See* TEX. R. 1.05(a).   The Attorney thus

---

[51]   (...continued)
public-record depositories . . . is generally known if the particular information is obtainable through publicly available indexes and similar methods of access."   The Attorney has made no such showing here. There is no indication in the record that absent the Press Release, a person could have learned of the existence of the State Suit from databases generally available to the public.   Thus, the Court does not decide whether the information in the public record was "generally known."   It is noted in passing that the Court's own research and the parties' briefing reveal no dispositive cases.   There is some support for both parties' positions, however. *Compare Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 603 n.19 (Tex. App.—San Antonio 1998, pet. denied) (Cantu, J., dissenting) (noting that "the fact that some of the documents may be public records does not necessarily make them 'generally known'" under Texas Rule 1.05(b)), *and King v. Byrd*, 716 So. 2d 831, 835 (Fla. Dist. Ct. App. 1998) ("We are not prepared to state that all information contained in any public document is 'generally known' within the meaning of the rule [prohibiting harmful use of former client's confidential information]"), *with Freund v. Butterworth*, 165 F.3d 839, 865 (11th Cir. 1999) (finding that information also contained in public arrest records and charging documents was generally known; therefore the information is not confidential under Florida's ethical rules prohibiting the use of former client confidences), *and Cohen v. Wolgin*, 1993 WL 232206, at *3 (E.D. Pa. Jun. 24, 1993) (holding that information from pleadings filed in prior litigation is generally known).

knowingly revealed information that was "confidential information" under the Texas Rules and applicable law.  *See id*.

The Attorney apparently contends that he was not aware that the information in the Press Release would be deemed confidential.  This argument is unavailing.  While he may not have anticipated the legal conclusion reached by this Court, he was fully aware of the details and the sources of the information he disclosed. A person need not know the legal consequences or unlawfulness of his act for the act to be knowingly done.  *See Osterberg v. Peca*, 12 S.W.3d 31, 39 (Tex. 2000) (applying a civil statute prohibiting a person from "knowingly" accepting unlawful campaign contributions; the court held that a plaintiff must prove a defendant "knowingly" accepted the unlawful contribution but is not required to prove the defendant knew the contribution was unlawful).  The Attorney's knowledge of the information and its sources suffices to make his conduct knowing for purposes of Texas Rule 1.05(b) and the Client's breach of fiduciary duty claim.[52]

The Attorney's defense fails also because he focuses only on facts in the Press Release that were available from the public record.  The Attorney does not persuasively

---

[52]     To the extent the Attorney contends that he did not act knowingly because he did not know the details of the Confidentiality Provision in the Settlement Agreement, the argument misses the mark.  The issue is whether the Attorney breached his fiduciary duty not to reveal to others a former client's confidential information; the issue is *not* whether he personally breached the Confidentiality Provision, knowingly or otherwise.  Even if the Attorney's knowledge of the confidentiality requirements in the Settlement Agreement were the focus, which it is not, the Attorney knew the settlement contained some confidentiality requirement. *See* Press Release, Client Exhibit 12.  The Attorney nevertheless elected not to obtain (or even seek) clarification about the scope of the Client's confidentiality obligation.  This reckless behavior constitutes a "knowing" act.

address the rest of the Press Release which contained the specific and non-public facts such as that there was a settlement and that his former client, the Client, was satisfied with the outcome.  These were personal and non-public matters that clearly fit any definition of "confidential" and thus the Attorney had no right to disclose them publicly or otherwise.

4.      **Conclusions on the Attorney's Fiduciary Duty of Confidentiality Under Texas Law**

The Court finds and concludes that the mandates of Texas rule 1.05 are extremely probative in defining the scope of an attorney's continuing fiduciary duty of confidentiality to a former client after termination of the attorney-client relationship.

The Court further finds and concludes that the Attorney had a fiduciary duty under Texas law to not disclose his former client's (the Client's) confidential information without the Client's permission.  The Court also holds that the Attorney did not seek or obtain the Client's permission to disclose any client information after the Attorney's relationship with the Client ended.  Nor did the Attorney have any basis recognized by Texas law (or the Texas Rules) to disclose the information in the Press Release.  Accordingly, the Attorney breached his fiduciary duty of confidentiality to the Client by issuing the June 3, 2004 Press Release.

E.      **Appropriate Remedies**

1.      **Compensatory Damages**

An award of actual damages for breach of fiduciary duty requires a showing of injury and causation.  *Longaker v. Evans*, 32 S.W.3d 725, 733 n.2 (Tex. App.—San Antonio 2000,

no writ); *see also Kelly*, 181 S.W.3d at 414 (noting a plaintiff can establish the third element of a breach of fiduciary duty claim by showing injury to the plaintiff or benefit to the defendant resulting from the wrongful conduct); *Punts*, 137 S.W.3d at 891 (same).

The Client has not proven by a preponderance of the evidence that he suffered any actual monetary damages as a result of the Attorney's breach of fiduciary duty. The Client testified that he paid $4,000 to $5,000 in attorneys' fees in defending against the Company's claims. However, the Court credits the billing records the Client submitted from the attorney who defended him against the Company's claims. These records establish that two companies, the Client's insurer and a corporation the Client controls but does not wholly-own, together expended a total of $45,637 defending the Client against the Company's claims. There is no probative evidence the Client personally has paid any of the fees or costs incurred defending against the Company's claims. These companies are not parties to this litigation.[53] The Client has not cited any authority conferring him standing to recover damages sustained by non-parties. Moreover, the Court is unpersuaded that the Client has or believes he in fact has any continuing obligation to pay the $1,026.30 still potnetially due in legal fees. The Client's attorney expressed doubts that he would collect the balance and did not state he intended to pursue collection efforts.

---

[53]     The Client also testified that he was preoccupied with the Company's claims against him and that the approximately $13,000 in defense fees paid by the corporation he controlled interfered with the success of the entity—at least to some unspecified degree. This conclusory and vague testimony is not probative. It is hard to imagine the success or failure of an otherwise viable company would hinge on a $13,000 expenditure. Furthermore, that entity, not the Client personally, has standing to recover such payments.

There is an alternative reason for this conclusion.  The Attorney filed a Motion to Exclude Damages Evidence [Doc. # 182] ("Motion to Exclude") on October 21, 2005.  The Client did not respond in opposition to this motion and the time to do so under the Local Rules of this District has long expired.  *See* S.D. TEX. R. 7.3.  The Client's failure to respond is taken as a representation of no opposition.  *See* S.D. TEX. R. 7.4.

Addressing the merits of that Motion to Exclude, the Attorney relies on Rule 37 of the Federal Rules of Civil Procedure.  Under Rule 37, a party who fails to make or appropriately supplement initial disclosures without substantial justification, will not be permitted to use such evidence at trial. *See* FED. R. CIV. P. 37(c)(1).  The Client, in his initial disclosures, stated that damages were "defense costs and loss of time, which cannot be calculated.  [The Client] will supplement."[54]  There is no evidence that the Client ever supplemented his initial disclosures or that he provided any discovery responses supporting these economic or non-economic ("loss of time") damages.  Accordingly, to the extent not moot by the Client's failure to prove actual economic damages, the Court grants the Attorney's Motion to Exclude.  All evidence of the Client's actual damages relating to the breach of fiduciary duty cross-claim against the Attorney is hereby excluded.

The Client's testimony at trial indicates he now seeks mental anguish damage arising from his concerns about the Press Release suggesting that he received millions of dollars in settlement of his claims against the Company and from having been sued by the Company

---

[54]     Client's Initial Disclosures, Exhibit A to the Attorney's Motion to Exclude, at 3.

because of the Attorney's Press Release.  The Client failed to claim mental anguish damages in his pleadings, in discovery, or in his initial disclosures.  Thus, he may not recover on that theory.  In any event, the Court is unpersuaded that the Client's proof of mental anguish rises to a level of severity to warrant monetary damages.  The testimony was vague and unpersuasive.  The Client's request for mental anguish damages is denied.

Another avenue the Client might have utilized to prove the "damages" element of his claim was to demonstrate that the Attorney "benefitted" from his breach of the duty of confidentiality.  The Client might have claimed that the Attorney received some identifiably financial benefit from the advertising contained in the Press Release.  *See Kelly v. Gaines*, 181 S.W.3d 394, 414 (Tex. App.—Waco 2005, pet filed); *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App.—Texarkana 2004, no pet.).  The Client, however, neither pleaded nor offered proof of any value or benefit received by the Attorney from the Press Release.  No damages are warranted.

### 2. Forfeiture

Under Texas law, where a court finds a "clear and serious" breach of fiduciary duty, a party is not required to prove injury or causation where the remedy sought is partial or total forfeiture.  *Burrow v. Arce*, 997 S.W.2d 229, 240–41 (Tex. 1999) ("An agent's breach of fiduciary duty should be deterred even when the principal is not damaged"); *see also Matter of Segerstrom*, 247 F.3d 218, 226 n.5 (5th Cir. 2001) (applying Texas law).  The party need not prove actual damages in order to obtain a fee forfeiture for the breach of a fiduciary duty owed to him because "[i]t is the agent's disloyalty, not any resulting harm, that violates the

fiduciary relationship and thus impairs the basis for compensation." *Burrow*, 997 S.W.2d at 238.  Forfeiture is an equitable remedy.  *Id.* at 234; *Jackson Law Office,* 37 S.W.3d at 23.

"A violation is clear if a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful." *Burrow*, 997 S.W.2d at 241.  The Court concludes that the Attorney's violation of the continuing fiduciary duty of confidentiality (founded in part on Texas Rule 1.05(b)(1)) as a result of the Press Release disclosure of confidential client information was clear in some respects and not in others.  As explained above, *see supra* Part II.D, the Court's conclusions about the scope of the continuing fiduciary duty of confidentiality are based in no small measure on the language of Texas Rule 1.05.  There is a dearth of Texas judicial authority, however, about whether disclosure by an attorney of matters concerning a former client is a revelation of confidential information when the matters are included in court pleadings the attorney filed on behalf of that client.  Moreover, until 1990, the Texas ethical rules (Texas Code DR 4-101), protected only "confidences" and "secrets," which arguably are types of information more narrow than "confidential information" under Texas Rule 1.05.  *See Guide to Texas Rules*, at 84–85.  DR 4-101 also protected confidences and secrets explicitly as to only existing clients, not former clients.  *See id.*  Therefore, to the extent the information in the Press Release was a matter of public record in the State Suit, the Attorney's fiduciary duty violation is not "clear" under *Burrow*.

On the other hand, the Attorney's Press Release disclosure of non-public information (*i.e.*, that the parties had settled the State Suit and the Attorney's impressions of his former

client's personal views about filing the State Suit, that client's prior relationship with the Company, and the settlement itself) was a clear violation of Texas Rule 1.05(b)(1) and the associated fiduciary duty of confidentiality.  The Attorney had no basis to believe that the Client had authorized those disclosures, let alone authorized an Internet news release of them.

The Court turns to the issue of "the seriousness of a violation, and hence whether and to what extent forfeiture is appropriate."  *See Burrow*, 997 S.W.2d at 243.  Under *Burrow*, courts are given discretion in determining the amount of compensation to be forfeited.  *Id.* at 245.  The notion of forfeiture is grounded on two principles.  First, if a fiduciary breaches his duties during the relationship of trust, the principal is considered not to have received what he bargained for.  *Id.* at 237–38.  Second, fee forfeiture is intended to discourage fiduciaries from being disloyal to their principals, *i.e.*, "to protect relationships of trust by discouraging agents' disloyalty."  *Id.* at 238.

The Texas Supreme Court has articulated a list of non-exclusive factors for courts to consider in deciding whether any fee forfeiture is warranted, and if so, what amount.  These factors include: "the gravity and timing of the violation, its wilfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies."  *Id.* at 243 (internal quotation omitted); *Jackson Law Office*, 37 S.W.3d at 29.

Because the Court's conclusions differ on whether the violation was "clear" as to specific components of the Press Release, the Court must address the seriousness of each

component separately.  It is permissible and equitable to award a forfeiture only if the violation was both "clear" and "serious."  *See Burrow*, 997 S.W.2d at 240–41.  The Attorney's breach of fiduciary duty was serious insofar as he disclosed in the Press Release the existence of the State Suit, the names of the parties, and the inflammatory allegations by the Client.

The Attorney submitted the Press Release for publication without even attempting to obtain permission to issue a press release at all, let alone attempting to check the information he included.  The Attorney offers no excuse for failing to contact the Client for permission to divulge the information the Attorney wanted to reveal.[55]  The Attorney had no deadline for issuance of the Press Release.  It was not issued until almost five months after the settlement was reached and three months after final payment was made.

The Client obtained no benefit from the Attorney's issuance of the Press Release; it was issued purely for the Attorney's self-promotion and potential financial gain.  There is no indication that the Attorney considered the impact of the Press Release on the Client.  Despite knowing that there was some confidentiality requirement imposed on his client by the settlement—as the Attorney stated in the Press Release itself—and knowing that before the State Suit was filed the Company had sought to keep the claims confidential for fear of copy-cat suits, the Attorney disregarded the likelihood that the Company would insist on

---

[55]     Moreover, prior to issuance of the Press Release, the Associate had declined the Attorney's request for the State Suit litigation file even though the settlement had been consummated.  The Attorney nevertheless did not hold off issuing the Press Release so he could investigate the Associate's reasoning.

strict confidentiality terms.  Thus, the Attorney's disclosures of the existence of the State Suit, the claims the Client made, and the associated factual contentions were serious.

The Court cannot conclude, however, for reasons noted above, that disclosure in the Press Release of the details of the State Suit was a clear violation of the Attorney's fiduciary duty to the Client.  Therefore, the Court cannot base a forfeiture on these portions of the Press Release.

The balance of the Press Release, that is, the Attorney's impressions of the Client's personal views about his relationship with the Company or the fact of the settlement, when considered independent of any reference to the publicly-filed information about the State Suit, requires a separate analysis.  The Court cannot conclude that these aspects of the disclosure were particularly significant.  In isolation, the Attorney's statements about these personal views of the Client in regard to an undefined dispute with a company would have caused at most inconvenience or annoyance to the Client.  It would not have likely resulted in the Company filing this federal suit.  Therefore, these disclosures, which were clear violations of the Attorney's fiduciary duty, were not serious.

The *Burrow* court also suggested that forfeiture analysis should consider whether the conduct was willful.  997 S.W.2d at 243.  While the Attorney intentionally issued the Press Release and knew its contents, the Court perceives that he likely misunderstood his fiduciary duties under Texas law with regard to the contents of the documents that were in the public court file.  The Court therefore holds that the Attorney did not specifically intend to violate his legal obligation, although in fact his deliberate actions in issuing the Press Release did

so.  *See State v. LaRue*, 152 S.W.3d 95, 96–97 (Ct. Crim. App.  2005); BLACK'S LAW DICTIONARY 1599 (6th ed. 1990).  Accordingly, the Attorney did not act willfully to harm the Client or to breach his fiduciary duty.

As to the violation's "effect on the value of the lawyer's work for the client," another *Burrow* factor for assessment of the seriousness of a fiduciary duty violation, *see Burrow*, 997 S.W.2d at 243, the Court concludes that the violation did not financially undermine the value of the State Suit or the settlement to the Client.  The Client was able to keep the settlement funds paid to him by the Company (after expenses and attorneys' fees) as agreed in the retainer agreement(s) with his attorneys.  The Client had insurance that covered almost all, if not all, of the defense fees and costs he will ever pay.

"[T]he remedy of forfeiture must fit the circumstances presented."  *Id.* at 241.  On balance, the Court cannot conclude that any component of the Attorney's violation of his fiduciary duty of continued confidentiality was both clear and serious.  Some of the disclosures constitute a clear but not serious violations of fiduciary duty, and some amounted to serious but not clear violations.  In the exercise of the Court's broad discretion, *see id.* at 243, the Court concludes that the public interest in maintaining the integrity of attorney-client relationships is served by the conclusions herein that the Attorney breached a fiduciary duty to the Client, but not ordering a forfeiture.[56]

---

[56]     The Court makes no determination on whether its finding that the Attorney knowingly violated his fiduciary duty to the Client provokes any reporting requirement.

Accordingly, although the Attorney had a fiduciary duty to the Client as his former client, and the Attorney breached that duty, the Client is not entitled to judgment on his breach of fiduciary duty claim.  The Client has not shown that the Attorney's breach either resulted in injury to the Client or benefit to the Attorney, *see Kelly*, 181 S.W.3d at 414; *Punts*, 137 S.W.3d at 891, and has not shown entitlement to a forfeiture.  The client thus has failed to prove the last element of his breach of fiduciary claim, and the Attorney is entitled to judgment in his favor.

## III.   <u>CONCLUSION AND ORDER</u>

Based upon the foregoing findings of fact and conclusions of law, the Court holds that the Client has proven by a preponderance of the evidence that the Attorney had a continuing fiduciary duty not to reveal confidential information to others, and that the Attorney violated that duty by issuing the Press Release.  The Client, however, has not proven he suffered actual damages, if he even preserved the right to claim the damages he now seeks in this case.  Nor has the Client proven that the Attorney benefitted financially or otherwise from the breach of fiduciary duty.  The Court also concludes no fee forfeiture is warranted because the Court cannot conclude as to any single component of the Press Release that the Attorney's breach of fiduciary duty was both clear and serious.  The Client therefore has failed to establish all the elements of a breach of fiduciary duty claim against the Attorney under Texas law.  Thus, even though a fiduciary "is held to something stricter than the morals of the market place," *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, J.), the Attorney is entitled to judgment in his favor.

There are no other remaining claims pending before the Court in this case. Accordingly, it is hereby

**ORDERED** that the Opinion and Final Judgment issued by the Court on January 31, 2006, are **VACATED** and will be superseded in their entirety by this Amended Opinion. It is further

**ORDERED** that judgment in this case will be entered in favor of the Attorney on the Client's breach of fiduciary duty cross-claim.  It is further

**ORDERED** that the Attorney's Motion to Exclude Damages Evidence [Doc. # 182] is **GRANTED**.  It is further

The Court will enter an amended final judgment in accordance with this ruling.

**SIGNED** at Houston, Texas, this **28th** day of **April, 2006**.

Nancy F. Atlas
United States District Judge